1  TRINETTE G. KENT (State Bar No. 222020)
2  Four Embarcadero Center, Suite 1400
   San Francisco, CA 94111
3  Telephone:  (480) 247-9644
4  Facsimile:  (480) 717-4781
   E-mail: tkent@lemberglaw.com
5
6  Of Counsel to
   Lemberg Law, LLC
7  43 Danbury Road
8  Wilton, CT 06897
   Telephone:  (480) 247-9644
9  Facsimile:  (203) 653-3424
10 *Attorneys for Plaintiffs*

11         UNITED STATES DISTRICT COURT
12        NORTHERN DISTRICT OF CALIFORNIA
13            SAN FRANCISCO DIVISION

14 George Torres, Oliver Zhang, and         Case No.:
15 Michael Abary,
                                            **COMPLAINT FOR DAMAGES**
16              Plaintiffs,
                                            **FOR VIOLATIONS OF:**
17        vs.                                 **1. BREACH OF WARRANTY**
18                                            **PURSUANT TO MAGNUSON-MOSS**
                                              **WARRANTY ACT;**
19 BMW of North America, LLC; and            **2. BREACH OF EXPRESS**
20 Bavarian Motor Works,                     **WARRANTY PURSUANT TO**
                                             **SONG-BEVERLY CONSUMER**
21              Defendants.                  **WARRANTY ACT;**
22                                           **3. BREACH OF IMPLIED**
                                             **WARRANTY PURSUANT TO**
23                                           **SONG-BEVERLY CONSUMER**
24                                           **WARRANTY ACT;**
                                             **4. VIOLATION OF CALIFORNIA'S**
25                                           **CONSUMER LEGAL REMEDIES**
26                                           **ACT; AND**
                                             **5. VIOLATION OF CALIFORNIA**
27                                           **BUSINESS PROFESSIONAL CODE**
28
                                            **JURY TRIAL DEMANDED**

For this Complaint, Plaintiffs,[1] George Torres, Oliver Zhang, and Michael Abary, by undersigned counsel, state as follows:

## PRELIMINARY STATEMENT

1.  This is a group action by the purchasers of vehicles (hereafter the "subject vehicles") manufactured and sold by Defendants, BMW of North America, LLC and Bavarian Motor Works.  Plaintiffs seek damages related to their vehicles' excessive consumption of engine oil and Defendants' failure to honor the terms of their warranty.

2.  Plaintiffs would not have purchased the subject vehicles had they been made aware of the subject vehicles' defective engines.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over this matter pursuant to the Magnuson-Moss Federal Act, 15 U.S.C. § 2310(d)(1)(B), in that Plaintiffs claim more than $50,000.00 in damages, exclusive of interest and costs, and under the doctrine of supplemental jurisdiction as set forth in 28 U.S.C. § 1367.

4.  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) as Defendants are subject to personal jurisdiction in this District and where Defendants, as principals, direct and control warranty repairs on covered vehicles through their agents consisting of a dealership network located in this District.

5.  Further, venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to Plaintiffs' claims occurred within this District.

## PARTIES

6.  Plaintiffs were, at all relevant times, adult individuals who either reside in California and/or who purchased motor vehicles in California that were

---

[1] Additional Plaintiffs may be added at a later date.

2

manufactured or sold by Defendants.

7.  Defendant BMW of North America, LLC ("BMW-NA") is organized under the laws of Delaware with its principal place of business located at 300 Chestnut Ridge Road, Woodcliff, New Jersey.  BMW-NA was created in 1975 to act as the United States importer of BMW luxury and performance vehicles, which were traditionally manufactured in Munich, Germany.  At all relevant times, BMW-NA was engaged in the business of importing, assembling, marketing, distributing, and warranting BMW automobiles in the State of California and throughout the United States.

8.  Defendant Bavarian Motor Works ("BMW-GER") is a corporation organized and existing under the laws of Germany, with its principal place of business located in Munich, Bavaria, Germany.  BMW-GER is the parent corporation of BMW-NA.

9.  BMW-NA and BMW-GER sell BMW vehicles through a network of independently owned dealerships across the United States that are agents of BMW-NA and BMW-GER.

## FACTUAL ALLEGATIONS APPLICABLE
## TO INDIVIDUAL PLAINTIFFS

### I.  George Torres

10.  Plaintiff George Torres (hereafter "G. Torres") is an adult individual residing in Castro Valley, California.

11.  On or about March 28, 2012, G. Torres purchased a used 2009 BMW 750li, Vehicle Identification Number WBAKB83509CY60658 (hereafter the "G. Torres Vehicle") from a private party in Buckeye, Arizona.  The purchase included BMW's warranty up to 100,000 miles.  At the time of purchase, the G. Torres Vehicle's mileage was 6,500.

COMPLAINT FOR DAMAGES

12.   Soon after purchasing the G. Torres Vehicle, G. Torres observed that it consumed an excessive amount of engine oil, which required him to add one quart of oil every 500 to 1,000 miles throughout the warranty period and well before Defendants' recommended oil change intervals.

13.   G. Torres notified an authorized dealer of Defendants on numerous occasions throughout the warranty period that the G. Torres Vehicle consumed an excessive amount of engine oil.

14.   In response, G. Torres was consistently told such oil consumption was normal, and accordingly, G. Torres was told the Vehicle's consumption of engine oil did not warrant any repairs.

15.   As a result of the G. Torres Vehicle's excessive consumption of engine oil, G. Torres had to add at least one to two quarts of engine oil to the G. Torres Vehicle in between Defendants' recommended oil change intervals in order to prevent the vehicle's engine from failing.

**II.   Oliver Zhang**

16.   Plaintiff Oliver Zhang (hereafter "O. Zhang") is an adult individual residing in Pleasonton, California.

17.   In July, 2009, O. Zhang purchased a new 2009 BMW 750li, Vehicle Identification Number WBAKB83529CY60077 (hereafter the "O. Zhang Vehicle") in California from an authorized dealer of Defendants.

18.   Within the first year of purchasing the O. Zhang Vehicle, O. Zhang observed that it consumed an excessive amount of engine oil, which required him to add one quart of oil every 700 miles throughout the warranty period and well before Defendants' recommended oil change intervals.

19.   O. Zhang notified an authorized dealer of Defendants on numerous occasions throughout the warranty period that the O. Zhang Vehicle consumed an excessive amount of engine oil.

4

COMPLAINT FOR DAMAGES

20.   In response, O. Zhang was consistently told such oil consumption was normal, and accordingly, O. Zhang was told the Vehicle's consumption of engine oil did not warrant any repairs.

21.   As a result of the O. Zhang Vehicle's excessive consumption of engine oil, O. Zhang had to add one to two quarts of engine oil to the O. Zhang Vehicle every 700 miles and in between Defendants' recommended oil change intervals in order to prevent the vehicle's engine from failing.

**III.    Michael Abary**

22.   Plaintiff Michael Abary (hereafter "M. Abary") is an adult individual residing in Raleigh, North Carolina.

23.   In August, 2010, M. Abary purchased a new 2011 BMW 5 Series 550i, Vehicle Identification Number WBAFR9C55BC617436 (hereafter the "M. Abary Vehicle") from BMW of Escondido in Escondido, California, an authorized dealer of Defendants.

24.   Within a year after purchasing the M. Abary Vehicle, M. Abary observed that it consumed an excessive amount of engine oil, which required him to add one quart of oil every 6,000 miles throughout the warranty period and well before Defendants' recommended oil change intervals.

25.   M. Abary notified an authorized dealer of Defendants on numerous occasions throughout the warranty period that the M. Abary Vehicle consumed an excessive amount of engine oil.

26.   In response, M. Abary was consistently told that "it was normal for turbo engines of this size" to burn oil, and accordingly, M. Abary was told the Vehicle's consumption of engine oil did not warrant any repairs.

27.   As a result of the M. Abary Vehicle's excessive consumption of engine oil, M. Abary had to add one quart of engine oil to the M. Abary Vehicle every 6,000

5

miles and in between Defendants' recommended oil change intervals in order to prevent the vehicle's engine from failing.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL PLAINTIFFS

28. Defendants manufactured and placed into the stream of commerce each of the aforementioned vehicles (the subject vehicles), which Plaintiffs subsequently purchased.

29. At the time Plaintiffs purchased the subject vehicles, Defendants made representations as to the subject vehicles' performance and quality and assured Plaintiffs that the subject vehicles were free from defects of workmanship.

30. Thereafter, Plaintiffs discovered that, unbeknownst to them, the subject vehicles' engines contain a manufacturing defect which causes each of the subject vehicles to consume engine oil at an extremely rapid rate.

31. Moreover, Plaintiffs discovered that as a result of the subject vehicles' above-described defect, Plaintiffs were required to regularly add additional engine oil to their vehicles in between Defendants' recommended oil change intervals in order to prevent their vehicles' engines from failing and suffering from other related damage.

32. In 2008, BMW introduced a new V8, twin-turbocharged engine, which BMW and enthusiasts refer to as the "N63." This large, high-performance engine was designed to be BMW's next generation V8 and was placed in certain BMW 5 Series, 6 Series, 7 Series, X5, and X6 vehicles from the 2009 through 2014 model years.

33. Upon information and belief, the N63 engine was included on the V8 versions of the following BMW vehicles:

F01 and F02 (7 Series Sedan) – produced from 3/2009 to 6/2012

F04 (Active Hybrid 7) – produced from 4/2010 to 6/2012

F07 (Gran Turismo) – produced from 9/2009 to 6/2012

COMPLAINT FOR DAMAGES

F10 (5 Series Sedan) – produced from 3/2010 to 7/2013

F12 (6 Series Convertible) – produced from 3/2011 to 7/2012

F13 (6 Series Coupe) – produced from 7/2011 to 7/2012

E70 (X5) – produced from 3/2010 to 6/2013

E71 (X6) – produced from 7/2008 to 6/2014

E72 (ActiveHybrid X6) – produced from 9/2009 to 9/2011

34.    The subject vehicles are all equipped with the N63 engine.

35.    The N63 has become widely known and described as defective throughout the automotive industry and the BMW-enthusiast community.  It is widely recognized that N63 engines consume excessive amounts of engine oil and require frequent engine repairs, especially as compared to other, similar vehicles not containing N63 engines.

36.    Some owners and enthusiasts blame the oil consumption on BMW's decision to place the N63's twin-turbochargers between the cylinder heads, and inside of the engine V, rather than outside of the engine V, away from sensitive components, where turbochargers are typically located.

37.    N63 vehicles are notorious for consuming excessive amounts of engine oil and frequently need additional engine oil between scheduled oil changes to prevent catastrophic engine damage or failure.

38.    The oil consumption defect was particularly apparent in a recent Consumer Reports study on excessive oil consumption.  Consumer Reports studied 498,900 vehicles across several makes and models for complaints about engine oil consumption and concluded that BMW's N63 engine was included on four out of the five most defective vehicles.

(http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

7

39.    The V8 version of the BMW 5 Series, which contained the N63 engine in 2011, 2012, and 2013 model years, was the worst performer in the study, with 43 percent of vehicles needing an additional quart of oil between oil changes as of 2015.  BMW's 6 Series and 7 Series, many of which contained the N63 engine, are the next worst performers.  Finally, the V8 version of the X5 was the fifth worst performer in the study.

40.    The Consumer Reports study also shows that a greater percentage of defective models start to consume oil as they age.  This means that large numbers of N63 owners will begin to experience the oil consumption defect in the near future if they have not already.

41.    Many purchasers of vehicles containing the N63 engine have become upset about the excessive engine oil consumption – which was not disclosed by BMW in the product literature – and have posted internet complaints about specific frustrations and hassles caused by the oil consumption defect.

42.    For example, one N63 purchaser started a thread entitled "Excessive oil consumption" on a BMW enthusiast website in November 2011:

> So I'm starting to get a little irritated at how much oil my 550
> is burning. In the last 6k I've had to add 1 quart of oil three
> times.  In other words it is burning a quart every 2000 miles.
> I've read about some people posting about having to add oil
> before but this much?? I've never owned a new car that burned
> any oil much less at this rate. Anyone else having this issue?
> Oh btw the car has 9120 miles and I put 3100 in Europe during
> my ED.  When I was to have redelivery I had the dealer do an
> oil change and was gonna change the oil every 7.5k.

(http://www.bimmerfest.com/forums/showthread.php?t=581072.)

8

COMPLAINT FOR DAMAGES

43.  A fellow BMW enthusiast responded with four separate links about the oil consumption issue and explained that the defect "was a hot topic back in September" 2011. (*Id.*)

44.  An Internet search of "N63 AND Burning Oil" reveals thousands of similar complaints regarding the oil consumption defect.[2]

45.  BMW had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs since the defect poses an unreasonable safety hazard, and because BMW had exclusive knowledge or access to material facts about N63 vehicles and engines, not known or reasonably discoverable by consumers. Defendants, however, failed to disclose the defect to consumers prior to or at the time of purchase or lease.

46.  The oil consumption defect has become so problematic that BMW has issued several technical service bulletins ("TSBs") to address complaints of excessive oil consumption and other problems related to the N63 engine.[3]

47.  With regard to the oil consumption issue, BMW issued the following TSBs:

> NHTSA ID Number: 10046859
>
> Service Bulletin Number: SIB-11-08-12
>
> Summary: DUE TO DAMAGED SEAL RING, DURING ASSEMBLY, ENGINE OIL IS LEAKING FROM ENGINE OIL PUMP VOLUME CONTROL VALVE GASKET SEAL RING. MODELS E70, E71, F01, F02, F04, F07, F10, F12, F13. NO MODEL YEARS LISTED.
>
> _____
>
> _

---

[2] See, e.g., http://www.bimmerfest.com/forums/showthread.php?t=581072 (last visited Mar. 21, 2016); http://www.e90post.com/forums/showthread.php?t=874786 (last visited Mar. 21, 2016).

[3] TSBs are recommended repairs issued by automotive manufacturers and directed only to automotive dealers. TSBs are frequently issued when a manufacturer receives widespread reports of a particular problem with its vehicles.

COMPLAINT FOR DAMAGES

NHTSA ID Number: 10045282

Service Bulletin Number: SIB-11-07-12

Summary: BMW: WHILE DRIVING VEHICLE, AT TIMES
WOULD BE ROUGH RUNNING; WHITE OR BLUE SMOKE
SEEN EXITING EXHAUST SYSTEM AND THE ENGINE OIL
IS CONSUMED ABOVE SPECIFICATIONS.

48.     In June 2013, BMW issued SIB-11-01-13, which took the extraordinary step of
changing engine oil consumption specifications for N63 vehicles, and
specifically instructed service technicians to add two quarts of engine oil to N63
vehicles when the vehicles instruct owners to add only one additional quart of
oil. (http://www.xbimmers.com/forums/showthread.php?p=14449679.)

49.     Instead of addressing the underlying cause of excessive oil consumption in
order to attempt to fix the defect, BMW recommended that its service
technicians simply add more engine oil to respond to consumer complaints.
Technicians were instructed to add two quarts of engine oil when the vehicle's
electronic system specifically called for one additional quart and to also add an
additional quart as the default fill on N63 vehicles.  While BMW did not
address the underlying problem, it likely reduced the number of complaints
because the engine oil level in the subject vehicles would now be overfilled, a
condition that can cause the engine oil to become aeriated, resulting in potential
oil starvation and reduced oil pressure.

50.     Technical Service Bulletin SIB-11-03-13 appears to be part of a campaign to
conceal the oil consumption defect and represent it as a normal feature of BMW
vehicles.  To this effect, BMW issued SIB-11-03-13, which upon information
and belief includes the following:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Service Bulletin Number: SIB-11-03-13

Summary: All engines normally consume a certain amount of engine oil. This is necessary in order to properly lubricate the cylinder walls, pistons, piston rings, valves and turbocharger(s), if equipped.  In addition, engines with less than 6,000 miles will generally consume additional engine oil because the internal engine components are not fully seated (break-in).  Therefore, engine oil consumption complaints received prior to 6,000 miles cannot be considered.

Once a new or remanufactured engine has accumulated 6,000 miles, oil consumption can be considered if there is a drastic change in the engine oil consumption rate (e.g., the engine oil consumption rate triples) under similar driving conditions.

Engines equipped with a turbocharger(s) will consume more engine oil than normally aspirated engines (non-turbocharged). The additional oil that is consumed in a turbocharged engine is mainly due to the turbocharger lubrication requirements.  Some of the engine oil normally migrates past the turbocharger turbine bearing seals and will enter the intake tract of the engine.

All turbocharged engines also require a complex crankcase ventilation system.  The crankcase ventilation system needs to maintain a small vacuum on the crankcase and not allow the crankcase to be pressurized.  Pressurizing the engine crankcase can lead to external engine oil leaks and increased engine oil

11

consumption via the piston rings and valve seals. When the load and the boost level of a turbocharged engine is varied, the path of the crankcase pressure is changed. During the crankcase ventilation path transition, a small amount of engine oil will pass through the crankcase ventilation system and is additionally consumed.  The additional engine oil consumption of a turbocharged engine, as compared to a normally aspirated engine, is normal and not a defect.

Oil Consumption specification:
- All BMW engines (excluding Motorsport) can consume up to 1 quart of engine oil per 750 miles at any time.

- Due to the increased engine power, all Motorsport engines can consume up to 2.5 quarts of engine oil per 1,000 miles at any time.

Turbocharged Engines:
Engines that are fitted with a turbocharger(s) will consume more engine oil than naturally aspirated engines (non-turbocharged engines).  In this case, a turbocharged engine could require topping of engine oil more frequently.  For vehicles with N63 and N63T engines, refer to SIB-11-03-13 for additional details.

51.   BMW included every conceivable driving situation within this Service Bulletin as a factor for engine oil consumption so as to minimize its own responsibility and/or deflect blame onto consumers for the oil consumption defect.  As can be seen from the TSBs, Defendants continued to misrepresent to their customers

COMPLAINT FOR DAMAGES

that the rate of oil consumption in the N63 engines was normal and to be expected in engines that are fitted with turbochargers.

52. BMW made these representations notwithstanding that the stated recommended oil service interval at the time of sale of the subject vehicles was the earlier of 15,000 miles or two years.  Of course, at the rate of engine oil consumption referred to in BMW's service bulletin, the N63 vehicles would consume nearly 20 quarts of engine oil between the recommended 15,000-mile oil service intervals.  Clearly, there is nothing normal or expected about this rate of oil consumption.

53. Many N63 purchasers and automobile consumer advocates disagree that this level of engine oil consumption is normal and instead believe that it is excessive and well beyond normal.

54. Consumer Reports offered its opinion of excessive oil consumption in the subtitle of its article: *Excessive oil consumption isn't normal: Automakers say adding oil between scheduled changes is acceptable. It's not.* (http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

55. Following hundreds of customer complaints about the oil consumption defect and other problems with N63 vehicles, BMW launched the "N63 Customer Care Package" (bulletin B001314) on December 29, 2014 (herein, "Customer Care Package").  The Customer Care Package consisted of several different measures, which merely mask, but do not correct, the serious design and/or manufacturing defects of the N63 engine including the oil consumption defect.

56. The Customer Care Package instructed service representatives to check each covered vehicle's timing chain, fuel injectors, mass air flow sensors, crankcase vent lines, battery, engine vacuum pump, and low pressure fuel sensor, and replace if necessary.  BMW instructed its service representatives to inspect and

13

replace these components for free, even if no longer covered by the manufacturer's standard four-year/50,000 mile warranty.

57. Also, BMW had long emphasized the fact that its vehicles can go long periods without service and sold many N63 vehicles with the promise of a two-year or 15,000 mile service interval. The Customer Care Package significantly reduced the mileage of its recommended engine oil change intervals for the subject vehicles. As a result, BMW reduced the oil change intervals from the earlier of 15,000/two years to the earlier of 10,000 miles or one year.

58. BMW simultaneously launched the "N63 Customer Loyalty Offer," which offered purchasers discounts on new BMW vehicles to replace their defective N63 vehicles.

59. BMW also launched a related "N63 Customer Appreciation Program," which authorized dealerships to provide purchasers with up to $50 of BMW merchandise or accessories.

60. Engine oil is important because it functions as an essential lubricant for the moving parts in internal combustion engines. The oil creates a film separating surfaces of adjacent moving parts to minimize direct contact, thereby decreasing heat caused by friction and reducing wear. Engine oil also has important cleaning and sealing functions, and serves as an important medium for dissipating heat throughout the engine. As a result, the subject vehicles need the proper amount of engine oil in order for the engine and its related parts to function safely.

61. As suggested by the N63 Customer Care Package, upon information and belief, the oil consumption defect impacts several components of N63 vehicles, either via combustion of excessive amounts of engine oil directly or by causing these components a lack of appropriate lubrication, which results in these components to prematurely fail and need frequent replacement.

14

62.   The oil consumption defect is a safety concern because it prevents the engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted.  Therefore, this oil consumption defect is unreasonably dangerous because it can cause engine failure while the subject vehicles are in operation at any time and under any driving conditions or speeds, thereby exposing Plaintiffs, their passengers, and others who share the road with them to serious risk of accidents and injury.

63.   Plaintiffs are informed and believe, and based thereon allege that BMW acquired its knowledge of the oil consumption defect in 2008, if not before, through sources not available to Plaintiffs, including but not limited to pre-release testing data, durability testing, early consumer complaints about the oil consumption defect to Defendants and their dealers, testing conducted in response to those complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates, as well as from other internal sources.

64.   Defendants had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs to Plaintiffs because the defect poses an unreasonable safety hazard, and because Defendants had exclusive knowledge or access to material facts about the subject vehicles that were not known or reasonably discoverable by Plaintiffs.  Defendants, however, failed to disclose the Oil Consumption Defect to consumers prior to or at the time of purchase or lease.

65.   The oil consumption defect can be and has been enormously consequential to Plaintiffs, burdening them with out-of-pocket expenses that would not be necessary but for such defect and depriving them of their original bargains.  First, excessive engine oil consumption requires additional service visits and increased maintenance costs due to the recently decreased oil change intervals, which Plaintiffs specifically sought to avoid by purchasing high-end BMW

15

vehicles.  Second, the oil consumption defect means that Plaintiffs must be concerned with obtaining BMW-approved engine oil when needed.  If Plaintiffs continue to drive without adding oil, their vehicles might catastrophically fail and strand them or potentially cause a life-threatening accident.  This discourages Plaintiffs from traveling long distances in their N63 vehicles or forces them to carry an extra supply of oil.  Third, Plaintiffs will suffer significant loss when they sell the subject vehicles because the reputation of these vehicles has been impaired by now-public research establishing that these vehicles suffer from the oil consumption defect.

66.   Plaintiffs each provided Defendants or one or more of their authorized dealers with an opportunity to repair the problems with the subject vehicles.  Defendants have neglected, failed, refused, or otherwise been unable to repair the substantial impairments to the subject vehicles within a reasonable amount of time or a reasonable number of attempts.

67.   The oil consumption defect experienced by Plaintiffs substantially impairs the use, value, and safety of the subject vehicles to Plaintiffs.

68.   Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to Plaintiffs' acceptance of the vehicles.

69.   Plaintiffs would not have purchased the subject vehicles had they known, prior to the respective times of purchase, that they would be required to regularly purchase and add large volumes of engine oil to the subject vehicles in order to prevent the subject vehicles' engines from failing.

## FRAUDULENT CONCEALMENT TOLLING

70.   Plaintiffs did not and could not have known that there was an oil consumption defect with the subject vehicles' respective engines at the time that they purchased the subject vehicles or any time thereafter.

16

71. The breach of warranties' four-year statute of limitations, which might otherwise apply to bar some of Plaintiffs' claims, should be tolled because of Defendants' knowing and active concealment of the fact that the subject vehicles' engines contain a defect.

72. While Defendants issued TSBs, making clear they were aware that there was a defect with the subject vehicles' engines, Defendants failed to disclose the existence of the defect to Plaintiffs.

73. Moreover, Defendants' authorized dealerships informed some or all Plaintiffs that the subject vehicles' excessive consumption of engine oil was normal, rather than the result of a defect.

74. Defendants kept Plaintiffs ignorant of vital information essential to the pursuit of their claims.

75. Defendants knowingly, affirmatively, and actively concealed the subject vehicles' defect from Plaintiffs.

76. Defendants were aware of the defect with the subject vehicles.

77. Based upon the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## FIRST CAUSE OF ACTION
### Breach of Warranty Pursuant to Magnuson-Moss
### Warranty Act, 15 U.S.C. §2301, *et seq.*

78. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

79. Plaintiffs are each a "consumer" as defined in 15 U.S.C. § 2301(3).

80. Defendants are each a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

81. The subject vehicles are each a "consumer product" as defined in 15 U.S.C. § 2301(6). 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer

COMPLAINT FOR DAMAGES

who is damaged by the failure of a warrantor to comply with a written or implied warranty.

82. 15 U.S.C. § 2304(a)(1) requires Defendants, as warrantors, to remedy any defect, malfunction, or nonconformance of the subject vehicles within a reasonable time and without charge to Plaintiffs.

83. Despite repeated demands, Defendants have failed to remedy the subject vehicles' oil consumption defect within a reasonable time, and/or a reasonable number of attempts, thereby breaching the written and implied warranties applicable to the subject vehicles.

84. As a result of Defendants' breaches of written and implied warranties, and Defendants' failure to remedy the same within a reasonable time and without charge to Plaintiffs, Plaintiffs have suffered damages.

**SECOND CAUSE OF ACTION**
**Breach of Express Warranty Pursuant to Song-Beverly**
**Consumer Warranty Act – Cal. Civ. Code §§ 1791.2 and 1792,** *et seq.*

85. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

86. Plaintiffs are "buyers" within the meaning of California Civil Code § 1791(b).

87. The subject vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

88. Defendants are the "manufacturer" of the subject vehicles within the meaning of California Civil Code § 1791(j).

89. In connection with the sale of the subject vehicles to the Plaintiffs, Defendants provided the Plaintiffs with a New Vehicle Limited Warranty and/or Certified Pre-Owned Warranty, under which they agreed to repair original components found to be defective in material or workmanship under normal use and maintenance, including the subject vehicles' engines.

18

90. Plaintiffs relied on Defendants' warranties when they agreed to purchase the subject vehicles, and Defendants' warranties were part of the basis of the bargain.

91. Defendants breached these express warranties in that the subject vehicles suffer from the above-described defects, which substantially impair their use, safety, and value to Plaintiffs.

92. Plaintiffs have given Defendants reasonable opportunities to cure said defects, but Defendants have been unable and/or have refused to do so within a reasonable time.

93. As a result of said nonconformities, Plaintiffs cannot reasonably rely on the subject vehicles for the ordinary purpose of safe, comfortable, and efficient transportation.

94. Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to Plaintiffs' purchase of the subject vehicles.

95. Plaintiffs would not have purchased the subject vehicles, or would have paid less for the subject vehicles, had they known, prior to their respective time of purchase, that the subject vehicles suffered from excessive oil consumption defect.

96. As a result of Defendants' breach of express warranties, Plaintiffs have been damaged.

### THIRD CAUSE OF ACTION
### Breach of Implied Warranty Pursuant to Song-Beverly
### Consumer Warranty Act – Cal. Civ. Code §§ 1791.1 and 1792, *et seq.*

97. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

98. Defendants are merchants with respect to motor vehicles.

99. The subject vehicles were subject to implied warranties of merchantability running from Defendants to Plaintiffs.

19

100. An implied warranty that the subject vehicles were merchantable arose by operation of law as part of the sale of the subject vehicles.

101. Defendants breached the implied warranty of merchantability in that the subject vehicles suffer from the above-described defect and thus were not in merchantable condition when Plaintiffs purchased them, or at any time thereafter, and the subject vehicles are unfit for the ordinary purposes for which such vehicles are used.

102. As a result of Defendants' breach of the applicable implied warranties, Plaintiffs suffered an ascertainable loss of money, property, and/or value of their vehicles.

103. Defendants' actions, as complained of herein, breached the implied warranty that the subject vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## FOURTH CAUSE OF ACTION
### Violation of California's Consumer Legal Remedies Act –
### Cal. Civ. Code § 1750, *et seq.*

104. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

105. California's Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

106. The subject vehicles are "goods" as defined in California Civil Code § 1761(a).

107. Each Defendant is a "person" as that term is defined in California Civil Code § 1761(c).

108. Each Plaintiff is a "consumer" as defined in California Civil Code § 1761(d).

20

109. Plaintiffs' purchase of the subject vehicles constitutes a "transaction" as defined by California Civil Code § 1761(e).

110. As alleged above, Defendants made representations concerning the subject vehicles that were misleading.

111. The acts and practices of Defendants as discussed throughout the Complaint, constitute "unfair or deceptive acts or practices" by Defendants that are unlawful, as enumerated in section 1770(a) of the California Civil Code, specifically in at least the following CLRA provisions:

> (a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;
>
> (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;
>
> (a)(7): Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and
>
> (a)(9): Advertising goods and services with the intent not to sell them as advertised.

112. Plaintiffs have suffered injury in fact resulting from Defendants' material omissions and misrepresentations because they paid an inflated purchase for the subject vehicles.

113. Defendants knew, should have known, or were reckless in not knowing that the subject vehicles contained a defect that caused them to consume oil at an abnormally and unreasonably high rate. As a result, Defendants knowingly and

COMPLAINT FOR DAMAGES

intentionally sold goods that were not of the value or quality that was represented.

114. Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

115. Defendants knew that their Class Vehicles and their engines were defectively designed or manufactured, would fail prematurely, would consume excessive oil, and were not suitable for their intended use.

116. Defendants were under a duty to Plaintiffs to disclose the defective nature of the subject vehicles and the oil consumption defect because:

   a. Defendants were in a superior position to know the true state of facts about the safety defect and associated repair costs in the subject vehicles and their engines;

   b. Plaintiffs could not reasonably have been expected to learn or discover that the subject vehicles and their engines had a dangerous safety defect until manifestation of the defect; and

   c. Defendants knew that Plaintiffs could not reasonably have been expected to learn or discover the safety and security defect and the associated repair costs that they caused until the manifestation of the defect.

117. In failing to disclose the oil consumption defect and the associated safety risks and repair costs that result from them, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

118. The facts concealed or not disclosed by Defendants to Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' vehicles or pay a lesser price.  Had Plaintiffs known about the defective nature of the subject vehicles and their

22

engines, they would not have purchased the subject vehicles or would have paid less for them.

119. The facts concealed and omitted by Defendants to Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the subject vehicles or pay a lower price.  Had Plaintiffs known about the oil consumption defect contained in the subject vehicles, they would not have purchased the subject vehicles or would not have paid the prices they paid.

120. Such misconduct materially affected the purchasing decisions of Plaintiffs.

121. The injuries suffered by Plaintiffs were proximately caused by Defendants' fraudulent and deceptive business practices.

122. Plaintiffs are entitled to injunctive relief, as well as monetary, compensatory, and punitive damages.

123. Plaintiffs have provided Defendants with notice of their alleged violations of the CLRA pursuant to California Civil Code § 1782(a).  Defendants have failed to provide appropriate relief for their violation of the CLRA.

## FIFTH CAUSE OF ACTION
### Violation of California Business Professional Code –
### Cal. Civ. Code § 17200

124. Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

125. The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.

126. Defendants have engaged in unfair competition and unfair, unlawful, or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs

23

that the subject vehicles suffer from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of this problem).  Defendants should have disclosed this information because they were in a superior position to know the true facts related to this defect, and Plaintiffs could not reasonably be expected to learn or discover the true facts related to this defect.

127.  The oil consumption defect constitutes a safety issue that triggered Defendants' duty to disclose the safety issue to consumers.

128.  These acts and practices have deceived Plaintiffs and are likely to deceive the public.  In failing to disclose this defect and suppressing other material facts from Plaintiffs, Defendants breached their duty to disclose these facts, violated the UCL, and caused injuries to Plaintiffs.  The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs, as they would have been to all reasonable consumers.

129.  The injuries suffered by Plaintiffs are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs should have reasonably avoided.

130.  Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

131.  Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business and Professions Code § 17200.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

   a.  An order approving revocation of acceptance of the subject vehicles;

24

b.  Money damages, in the form of a refund of the full contract prices, including trade-in allowance, taxes, fees, insurance premiums, interest, and costs, and a refund of all payments made by Plaintiffs on the subject contracts;

c.  Equitable relief including, but not limited to, replacement of the subject vehicles with new vehicles, or repair of the defective subject vehicles with an extension of the express and implied warranties, and service contracts which are or were applicable to the subject vehicles, in the event that Plaintiffs are not found to be entitled to revocation;

d.  Incidental and consequential damages;

e.  Punitive damages;

f.  Reasonable attorneys' fees; and

g.  Such other and further relief as this Court deems just and proper.

## TRIAL BY JURY DEMANDED ON ALL COUNTS

Dated:  January 7, 2019

TRINETTE G. KENT

By:___/s/  Trinette G. Kent___
Trinette G. Kent, Esq.
Lemberg Law, LLC
Attorney for Plaintiffs

COMPLAINT FOR DAMAGES